**SCOTT PAPER COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION.**

**No. 13537.**

United States Court of Appeals
Third Circuit.

Argued Nov. 17, 1961.

Decided March 27, 1962.

Gerhard A. Gesell, Washington, D. C. (William R. Scott, Miles W. Kirkpatrick and Morgan, Lewis & Bockius, Philadelphia, Pa., Paul C. Warnke, Brice M. Clagett and Robert J. Muth, Washington, D. C., on the brief), for Scott Paper Co.

Frederick H. Mayer, St. Louis, Mo. (James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, William F. Upshaw, on the brief), for the Federal Trade Commission.

Before KALODNER, GANEY and SMITH, Circuit Judges.

KALODNER, Circuit Judge.

On June 1, 1956, the Federal Trade Commission ("Commission") issued a complaint charging that the acquisition of certain corporations by Scott Paper Company ("Scott") constituted a violation of Section 7 of the Clayton Act, as amended.[1] At the conclusion of hearings before a Hearing Examiner, he found that a violation of Section 7 had not been established and dismissed the complaint. On appeal to the Commission by counsel

---

1. 64 Stat. 1125, 15 U.S.C.A. § 18. The pertinent portion of Section 7 of the Clayton Act, as amended, provides:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

supporting the complaint, the decision of the Hearing Examiner was vacated and set aside. The Commission held that the acquisitions were violative of Section 7, and issued an order of divestiture. Pursuant to Section 11(c) of the Clayton Act, as amended,[2] Scott filed this petition to review and set aside the order of the Commission.

Scott Paper Company, a Pennsylvania corporation with its principal offices located at Chester, Pennsylvania, manufactures and sells various trade-marked paper products, including toilet tissue, facial tissue, paper napkins, paper towels, and household waxed paper (the first four of these products will hereinafter be referred to as sanitary paper products). In the manufacture of these products, timber is made into pulp, the pulp becomes paper stock, and paper stock is converted into the finished product.

Scott sells its sanitary paper products and household waxed paper to two classes of customers. Its "resale" products are intended for resale to the public and are sold by Scott largely to retail stores, primarily grocery chains and supermarkets. Scott's "industrial" products are intended for use in such establishments as industrial plants, offices, and hotels and are usually distributed through wholesalers.

Three acquisitions by Scott are challenged by the Commission in this proceeding. Scott acquired the assets of the three corporations by the issuance of its common stock. Soundview Pulp Company ("Soundview"), located at Everett, Washington, was acquired November 9, 1951, by the issuance of stock having a market value of approximately $60,000,-000; Detroit Sulphite Pulp & Paper Company ("Detroit") of Detroit, Michigan, on September 2, 1954, by the issuance of stock having a market value of approximately $11,000,000; Hollingsworth & Whitney Company ("Hollingsworth") of Boston, Massachusetts, on October 27, 1954, by the issuance of stock having a market value of approximately $38,000,000. None of the acquired corporations produced sanitary paper products or household waxed paper. Soundview had extensive timber holdings and produced and sold pulp. Detroit had a pulp mill and made paper stock for sale to others for converting into finished products.[3] Scott was one of its customers, and Scott's purchases included Detroit's entire output of wax base stock for use in making Scott's household waxed paper. Hollingsworth manufactured an extensive line of paper stock. Its assets included timberland as well as pulp and paper mills.

Scott spent large sums of money on capital improvements and additions to the acquired properties. New buildings and paper mills were erected. New paper machines and converting equipment were installed, and some of the existing paper machines at Detroit and Hollingsworth were rebuilt for the manufacture of Scott's products. Production of sanitary paper products and household waxed paper at the acquired properties commenced when the first of the newly installed paper machines went into operation at Soundview in January, 1954. No production from the rebuilt machines was obtained until 1955 when production started at Detroit and Hollingsworth. The total cost of the additions and improvements at the acquired properties through June 30, 1956, amounted to approximately $45,000,000 at Soundview, $7,800,000 at Detroit, and $18,000,000 at Hollingsworth. Through 1958 the totals were $49,828,926 at Soundview, $11,252,-589 at Detroit, and $48,121,987 at Hollingsworth.

The significant findings of the Commission may be summarized as follows:

The "lines of commerce" in which the effects of the acquisitions are to be measured consist of "toilet tissues, paper towels, facial tissues, paper napkins and household waxed paper separately and collectively"; the appropriate geographic market is the entire United States;

---

2. 73 Stat. 243, 15 U.S.C.A. § 21(c).

3. Detroit also had timber holdings, but these were sold by Scott subsequent to the acquisition.

the acqusitions, instead of constituting horizontal acquisitions of corporations which produced and sold finished sanitary paper products in competition with Scott, were primarily vertical in that they supplied Scott with raw and semi-processed materials and additionally afforded facilities for making finished products after conversions or improvements and new construction; in 1950 Scott was the "dominant" producer in the sanitary paper products and household waxed paper industry, and in 1955 Scott had successfully retained and enhanced its position; the challenged acquisitions have been the direct cause of Scott's progressively increasing market power and dominance; Scott's greatly expanded production and concomitant enhanced market position primarily resulted from improvements and additions made at the acquired properties; the finished products manufactured on the new machines as well as those manufactured on the rebuilt machines are to be regarded as increments or fruits of the acquisitions and each helped Scott to meet the "pent-up" demand for its products; the acquisitions afforded production and marketing economies and other advantages which could be reflected by Scott in price, advertising, promotion, or profit; Scott has been the industry's leader in advertising; Scott's pricing policies have far-reaching effects in the industry; there are barriers to entry into the industry by new firms; Scott's acquisition of Detroit tended to foreclose Detroit as a potential supplier of wax base stock for Scott's competitors; and all three of the acquired companies were potential competitors of Scott in the production and sale of sanitary paper products and household waxed paper.

In holding that the acquisitions violated Section 7, the Commission set forth its reasoning as follows:

"Before the acquisitions, the respondent produced less than half of its requirements for pulp. It now markets pulp. As noted in our accompanying findings as to the facts, the acquired companies, though not actual competitors of the respondent in the sale of finished products, were potential competitors. The timber resources, pulp mills, and other facilities which passed from the acquired companies to Scott were extensive and diversified and clearly tended to increase the levels of concentration which had prevailed in the sanitary paper products field. Market concentration in the sanitary paper products industry is high. In 1955, the four largest producers accounted for two-thirds of all products marketed for resale, as distinguished from those sold for industrial use.

"In view of the respondent's dominant position in the line of commerce for sanitary paper products and certain of its component relevant markets before the acquisitions, any acquisition which tended to assist its distribution of trademarked products could reasonably have repercussions in those markets. The present and reasonably probable future impacts of the challenged acquisitions are of much greater magnitude, however. In consequence of the acquisitions, the respondent (1) has decisively strengthened its ability to compete in that it gained needed materials and production facilities which also afforded economies and strategic marketing advantages that could be reflected in prices or profits, or in advertising and product diversification for further enhancing its position in the relevant markets, and (2) has substantially increased its shares in those markets over their prior high levels.

"Such expanded market shares did not come automatically as legacies of horizontal acquisitions but were instead achieved in the market place with telling contributions out of the acquired properties. Each of the acquisitions has concomitantly increased and will continue to increase the respondent's capacity to

exert the power inherent in its dominant market position. As a corollary effect, the acquisitions have tended to widen the great disparities in resources and ability to compete which previously existed between the respondent and many of its rivals.

"From the foregoing, it follows that the effect of the acquisitions may be substantially to lessen competition and to tend to create a monopoly in the relevant lines of commerce. * * *"

The order of divestiture issued by the Commission requires that Scott divest itself of the acquired properties, together with "such plants, machinery, buildings, improvements, equipment and other property of whatever description that has been added, modified, modernized or placed on the premises of each of" the acquired companies by Scott "as may be necessary to restore each of the three * * * companies as a competitive entity to substantially the same operating form and substantially equivalent productive capacity as existed at or about the time of acquisition." The Commission expressly relied on its finding that the acquired companies had been potential competitors of Scott in the sale of finished products as the basis for the requirement that Scott restore the companies as competitive entities.

In petitioning this Court for review of the Commission's order, Scott challenges virtually every finding and conclusion of the Commission. Its main contentions are: (1) the Commission's findings do not properly define either the relevant lines of commerce or the relevant geographic market; (2) there was no proof that Scott's market shares increased as a result of the acquisitions; (3) no competitior of Scott was, or is likely to be, cut off from any raw materials or from any market, and no acquired company was a competitor or potential competitor of Scott, and accordingly there was no proof that the acquisitions could foreclose competition; (4) Scott does not have, and is not likely to attain, any power over price or market entry; and (5) the Commission is attempting to apply a novel "dominance" theory that would permit a conclusion of illegality without a finding that anti-competitive consequences have occurred. In support of this last contention Scott urges that the usual horizontal or vertical elements of a Section 7 case—the elimination of a competitor or the foreclosure of sources of supply or market outlets—are not present, and that, contrary to the statutory mandate, the Commission is basing its conclusion of illegality solely on Scott's size and market share.

The Commission, on the other hand, here asserts that the lines of commerce and the geographic market were correctly defined and that Scott's increased market share was correctly attributed to the acquisitions. The Commission does not, however, controvert Scott's assertions that Scott has no control, or likelihood of control, over price or market entry and that the acquired companies were neither actual nor potential competitors of Scott. Nor does the Commission deny, except with respect to the Detroit acquisition, that the usual elements of a Section 7 violation are not present here. The Commission urges that the statutorily proscribed effects are present nevertheless and that it, in holding the acquisitions illegal, did not rely merely on Scott's dominant position.

On this review the Commission lays great stress, almost to the exclusion of other considerations, on what it terms "a comprehensive market survey" on which it premised its ultimate fact-finding that Scott, by the challenged acquisitions, "has substantially increased its shares in those markets over their prior high levels" to a degree "that the effect of the acquisitions may be substantially to lessen competition and to tend to create a monopoly in the relevant lines of commerce."[4] This survey was conducted by

---

4. The quoted statements are from the Opinion of the Commission.

the Commission pursuant to its authority under Section 6(b) of the Federal Trade Commission Act.[5] Questionnaires were sent to all producers of sanitary paper products and household waxed paper, requiring them to report their shipments, in tons, of these products for the years 1950 and 1955. Scott's shipments and its market shares, according to the survey, were as follows:

| | Shipments by Scott (in tons) | | Per Cent of Market (based on shipments) | |
| --- | --- | --- | --- | --- |
| | 1950 | 1955 | 1950 | 1955 |
| All Products Covered by the Survey | 317,213 | 504,216 | 26.76 | 32.72 |
| All Toilet Tissue | 194,029 | 280,125 | 37.27 | 40.39 |
| Resale Toilet Tissue | 185,199 | 267,423 | 41.57 | 44.83 |
| Regular Grade | 146,735 | 205,127 | 45.05 | 49.45 |
| Facial Grade | 38,464 | 62,296 | 31.95 | 34.23 |
| Industrial Toilet Tissue | 8,830 | 12,702 | 11.84 | 13.12 |
| All Paper Towels | 61,479 | 113,879 | 22.98 | 30.89 |
| Resale | 31,166 | 75,033 | 38.12 | 61.73 |
| Industrial | 30,313 | 38,845 | 16.32 | 15.72 |
| Facial Tissue | 24,033 | 38,901 | 13.52 | 19.65 |
| All Paper Napkins | 0 | 17,509 | 0 | 10.02 |
| Resale Paper Napkins | 0 | 17,509 | 0 | 17.32 |
| Regular Grade | 0 | 0 | 0 | 0 |
| Facial Grade | 0 | 17,509 | 0 | 56.58 |
| Industrial Napkins | 0 | 0 | 0 | 0 |
| Household Waxed Paper | 37,672 | 53,802 | 38.84 | 50.75 |

While the survey statistics disclose that Scott's market shares were larger in 1955 than in 1950, Scott contends that they do not support the Commission's finding that this increase in market shares was a result of the challenged acquisitions. Scott asserts that no part of the increase in its market shares prior to 1955 can be attributed to any of the mooted acquisitions inasmuch as none of the paper machines acquired thereby came into production prior to that year; the Commission's survey provides no way of ascertaining when the increase was achieved; its market shares might, for example, have increased in 1951 and 1952 and decreased in 1953, 1954 and 1955; while such developments would be consistent with the survey they would not be consistent with the finding that the increase in Scott's market shares was the result of the acquisitions; the proper year to compare with 1955 in order to determine the effects of the ac-

5. 15 U.S.C.A. § 46(b). This section provides:

"The commission shall * * * have power— * * *

"(b) To require, by general or special orders, corporations engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission."

quisitions upon Scott's market shares is 1954, the last year before the effects of the acquisitions became manifest; and even if the production at Soundview in 1954 from the paper machines installed by Scott is regarded as "acquired" production, the survey is still without probative force, as the proper year to compare with 1955 would be 1953.

On the score of the foregoing it is appropriate to note at this juncture that the Hearing Examiner in the second of his Initial Decisions was in substantial accord with Scott and expressly ruled:

"The survey is of no material assistance in resolving the issues presented by the present proceeding. * * *

"[I]t is concluded that while the survey may supply interesting statistical information of a general nature regarding the sanitary paper products industry, *it is without any substantial probative value* on the vital question of the effects of the challenged acquisitions." (emphasis supplied)[6]

The Commission on this review is adamant in its view that "1950 and 1955 were the proper benchmark years for the purpose of measuring the impact of the challenged acquisitions upon Scott's market shares." (Commission's Brief)

The parties to this review are as far apart as the poles not only as to the significance of the survey but as to the inferences which they assert may be drawn from its content and lack of content.

On the present state of the record, so far as the mooted survey is concerned, we would of necessity have to resort to speculation as to what happened with respect to Scott's market shares during the years 1951 to 1954, inclusive.

Novel issues of law of transcending importance in the interpretion and application of the anti-trust laws are presented by this petition for review. The resolution of these issues of law requires that whatever factual premise may be asserted as the basis of their application be as definitive and revealing as may be possible and capable of proper assessment.

The Commission itself only recently[7] declined to act upon its Hearing Examiner's decision because of its expressed reluctance to place "too strong a reliance upon treacherous conjecture." What the Commission there said in remanding to the Hearing Examiner for the taking of additional evidence is pertinent here:

"The record as presently constituted does not provide an adequate basis for determining the legality of this acquisition. In the circumstances, we might dismiss the complaint * * *. We believe, however, that the public interest will be better served * * * by our remanding the case for the taking of additional evidence. * * *"

In the instant situation we are of the opinion that the market survey should reflect Scott's market shares for the years 1951, 1952, 1953 and 1954.

For the reasons stated the cause will be remanded to proceed in accordance with this opinion. The Order Pendente Lite of March 20, 1961 will continue in effect.

6. The Hearing Examiner in his second Initial Decision premised his view with respect to the lack of probative value of the survey on two grounds: (1) that it proceeded on the theory that the geographical area of competition in the sanitary products industry is nationwide and

"there is no effective nationwide area of competition", and (2) the choice of the year 1950 as the starting point of the survey and its failure to include data as to the years 1951, 1952, 1953 and 1954.

7. Procter & Gamble Co., 3 Trade Reg.Rep. par. 15,245 (1961).