UNITED STATES of America,
Plaintiff,

v.

KIMBERLY–CLARK CORPORATION,
Defendant.

Civ. No. 40529.

United States District Court
N. D. California.

Feb. 17, 1967.

Lyle L. Jones, James J. Coyle, Mary P. Clark, Albert P. Lindemann, Jr., L. David Cole, James E. Figenshaw, Antitrust Div., Dept. of Justice, San Francisco, Cal., for plaintiff.

Stuart S. Ball, H. Blair White, George A. Platz, Chicago, Ill., Robert D. Raven, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER DIRECTING DIVESTITURE.

ZIRPOLI, District Judge.

On February 15, 1962, the United States brought this action under the provisions of Section 15 of the Clayton Act (15 U.S.C. § 25), charging that the acquisition by Kimberly-Clark Corporation (K-C) of the assets and business of Blake, Moffitt & Towne (BMT)[1] vio-

1. Incorporated in the pre-trial order is a stipulation (hereinafter Stip. 1) of the parties, which shows the makeup of BMT. It provides:

Prior to June 30, 1961, Blake, Moffitt & Towne was a California corporation, with its principal office in San Francisco, California, which, as of June 30, 1961, owned a controlling interest in the following four subsidiary corporations: Blake, Moffitt & Towne of Washington, Inc., a Washington corporation, in which the parent corporation owned 75.9% of the outstanding stock; Blake, Moffitt & Towne, Inc., a Washington corporation in which the parent corporation owned 81.-07% of the outstanding stock; Blake,

Moffitt & Towne, Inc., an Idaho corporation in which the parent corporation owned 80% of the outstanding stock; and Blake, Moffitt & Towne, an Oregon corporation in which the parent corporation owned 87.8% of the outstanding stock.

On June 30, 1961, K-C acquired substantially all of the assets and business of each of the five Blake, Moffitt & Towne corporations referred to in the above paragraph.

As of June 29, 1961, Blake, Moffitt & Towne, a California corporation, actively operated wholesale trade establishments in 21 cities located in Arizona, California and Nevada; Blake, Moffitt & Towne, an Oregon corporation, actively operated

lated Section 7 of the Clayton Act, which, as amended in 1950 by the Celler-Kefauver Anti-Merger Bill, provides in relevant part as follows:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. (15 U.S.C. § 18)

In substance, the United States contends that the acquisition by K-C of BMT violates Section 7 of the Clayton Act because it may substantially lessen competition or tend to create a monopoly in the nation as a whole and in the western market in the distribution and sale through paper merchants of four categories of products, namely, (1) printing and fine paper; (2) sanitary paper products; (3) coarse paper and paper products; and (4) printing and fine paper and coarse paper and paper products combined (i. e., (1) and (3) combined).

The government further contends that this acquisition should be considered a part of a trend of similar acquisitions of paper merchants, which, if unchecked, will lead to the domination of the paper merchant market by a few large manufacturers.

The trial of this case commenced on January 3, 1966 and was concluded on February 10, 1966. Thereafter the case was briefed and submitted to the Court for its decision.

There is no dispute as to the interstate character of the business of both the acquiring company and the acquired company. The government made no serious effort to prove its monopoly charge and concentrated its evidence on the charge that this acquisition may substantially lessen competition.

For the government to prevail, the evidence in this case must establish:

(1) that K-C is a leading paper manufacturer;

(2) that BMT is a leading chain of paper merchants;

(3) that the "paper merchant" is a recognized and meaningful commercial medium for the effective distribution and sale of paper and paper products;

(4) that one or more of the above listed categories of paper products, separately or in combination, constitutes a relevant line of commerce within the meaning of Section 7;

(5) that the section of the country which plaintiff contends is affected by this acquisition is a relevant section of the country in which to measure the effect of this acquisition; and

(6) that this acquisition may substantially lessen competition.

The Court is satisfied that the plaintiff has sustained its burden, in that each of the above required elements of proof is clearly established by the evidence in this case. Each of these elements of proof will be separately considered.

*K-C is a leading paper manufacturer.*

By any standard, K-C is one of the leading paper manufacturers in the United States. As the successor of incorporated and unincorporated entities, which have been engaged in the manufacture of paper since 1872, K-C has in-

---

wholesale trade establishments in 4 cities located in Oregon; Blake, Moffitt & Towne, Inc., an Idaho corporation, actively operated wholesale trade establishments in 1 city located in Idaho; Blake, Moffitt & Towne, Inc., a Washington corporation, actively operated 1 wholesale trade establishment in Washington; and Blake, Moffitt & Towne of Washington,

Inc., a Washington corporation, actively operated wholesale trade establishments in 4 cities located in Washington.

As of June 29, 1961, each of the wholesale trade establishments described in the above paragraph, acted as a wholesaler of paper, paper products and various other items.

creased its sales and assets by acquisition, expansion, and equipment improvement to the point that by 1962 it had total assets of $443 million and total sales of $515 million. In 1962 K-C was the fourth largest corporation, in terms of sales, engaged primarily in the manufacture of paper and paper products.[2] Based upon statistics compiled for the Census of Manufacturers for 1958, K-C accounted for approximately 7½ per cent of total United States market shipments of printing and fine papers and more than 24 per cent of all shipments of sanitary products (Gov't Exh. 65, Gov't Exh. 67). Its share of shipments of particular products within those broader classifications is substantially greater. For example, it represents 16.06 per cent of total national market shipments of paper machine coated printing and converting paper; 32.79 per cent of total national market shipments of thin paper; 59.96 per cent of total national shipments of facial tissues; and 52.65 per cent of total national shipments of sanitary napkins (Gov't Exh. 65, Gov't Exh. 67).

*BMT was a leading paper merchant chain.*

With total sales of $65 million in 1960, BMT was a significant paper merchant chain. As a successor of incorporated and unincorporated business entities, it has been in the paper merchant business on the West Coast since 1855, and by 1960 it operated 34 paper merchant outlets, serving primarily the 6 western states of Arizona, California, Idaho, Nevada, Oregon and Washington. All of the BMT outlets were dual houses, in that they carried both printing and fine and coarse or industrial papers and paper products.[3] Defense witnesses from BMT testified that BMT's primary trading area as of 1965 was the 6 western states listed above (Def. Exh. 87–91, 174, Tr. 2753–54). Although BMT's principal suppliers were located throughout the United States, 69 per cent of its purchases came from mills in those 6 states (Gov't Exh. 165, p. 4).

At the time of the acquisition (June 30, 1961), BMT was the largest chain of paper merchants operating in the 6 west-

2. The following table, which appears in government's Exhibit 121, compares K-C's sales and assets with 8 of the leading firms engaged primarily in the manufacture and conversion of paper and paper products. It was prepared from Moody's Industrial Manual and shows the 1962 industry rank, total dollar sales and total assets of the 8 leading firms engaged primarily in the manufacture and conversion of paper and paper products.

| | Sales * | Assets * |
|---|---|---|
| International Paper | $ 1,095,671,662 | $ 1,009,398,253 |
| Crown Zellerbach | 589,101,779 | 615,959,105 |
| St. Regis | 579,017,961 | 584,731,035 |
| Kimberly-Clark | 515,238,667 | 443,678,485 |
| Mead Corporation | 435,116,370 | 315,231,807 |
| Champion | 357,689,940 | 253,844,773 |
| Scott Paper | 354,449,607 | 365,985,893 |
| West Virginia Pulp & Paper | 276,605,000 | 275,012,000 |

* Sales figures do not necessarily consist entirely of the sales of paper and paper products; asset figures do not necessarily consist entirely of assets used in the manufacture, conversion, distribution or sale of paper and paper products.

3. The other categories of paper merchants are "fine" houses, which do not handle industrial products and "industrial" or "coarse" houses, which do not handle fine paper.

ern states not owned by a paper mill, and, in that area, it accounted for approximately 15 per cent of all paper merchant sales (Gov't Exh. 75). In the nation as a whole, its sales were about 2 per cent of all paper merchant sales (Gov't Exh. 77). Quite naturally, BMT's share of total paper merchant sales is larger in specific states and standard metropolitan statistical areas (Gov't Exh. 72 and 74).

In order that the remaining elements of proof enumerated above may be understood and evaluated in proper perspective, it is necessary to review the background to the acquisition of BMT by K-C, its operation of BMT subsequent to acquisition and the manner in which such acquisition represents a part of a substantial and significant trend of acquisitions of paper merchant chains by large manufacturers.

*Background of the acquisition.*

Dean Witter & Company, a firm of investment bankers, was instrumental in effecting the acquisition of BMT by K-C. For a number of years prior to the acquisition, representatives of Witter had sought to persuade officials of BMT to consider the public financing of BMT or the sale of BMT to a larger corporation with public financing. Over the years BMT's sales and profits had increased.[4] The primary reason why the BMT management was willing to consider the sale of BMT to another corporation was to achieve the liquidity of investment which would result from owning stock in a corporation which was widely traded on the stock exchange.[5]

The BMT acquisition was one of a number of acquisitions by K-C.[6] By

---

4. The following table shows BMT sales and profits in the 3 years prior to the acquisition (Stip. 1, ¶29):

| | | Net Income | |
| Year | Sales | Before Taxes | After Taxes |
|---|---|---|---|
| 1958 | $ 59,265,000 | $ 1,013,308 | $ 511,908 |
| 1959 | 65,266,000 | 1,228,302 | 604,902 |
| 1960 | 65,764,000 | 1,440,559 | 692,459 |

---

5. BMT had the alternative of public financing, which Witter concluded was possible, but BMT chose to sell to another corporation.

6. K-C's primary acquisitions in the period 1951–1962 are as follows (Gov't Exh. 141):

| Date | Acquisition |
|---|---|
| 1951 | Munising Paper Co. |
| 1955 | International Cellucotton Products |
| 1956 | Neenah Paper Company |
| 1957 | Peter J. Schweitzer, Inc. |
| 1959 | American Envelope Co. |
| 1961 | Century Envelope Co., Inc. |
| 1961 | Ralph L. Smith Lumber Co. |
| 1961 | Blake, Moffitt & Towne |
| 1962 | Coosa River Newsprint Co. |

In the prospectus dated January 23, 1959, and filed in connection with the acquisition of the American Envelope Company, K-C made the following statement: "During the last five years the business of the corporation has grown substantially through the transactions described herein under 'Recent Acquisitions'." (Gov't Exh. 53A).

virtue of such acquisitions, K-C added product lines and developed opportunities for vertical relationships. For example, before acquiring the American and Century envelope companies, K-C was not in the envelope business. Now, the Karolton Envelope Company (a division of K-C), formerly a wholly-owned subsidiary of the American Envelope Company, is, like BMT, an important customer for K-C's paper. Moreover, since BMT was acquired by K-C, it has become a substantial purchaser of envelopes from Karolton.

When merger negotiations were instituted between BMT and K-C, K-C had already entered into negotiations looking toward the acquisition of the Ralph L. Smith Lumber Company. It was anticipated that when the negotiations resulted in the acquisition of Smith, K-C would construct a printing paper mill on the Smith site at Anderson, California. (That mill is sometimes referred to as the "Shasta Mill"). In 1956, five years before the Smith acquisition, K-C opened a mill and converting plant at Fullerton, California, which produces sanitary paper products and distributes them in the 11 western states.

The construction of the mill at Fullerton, California, was K-C's initial step in the development of "a separate, fully-integrated manufacturing operation in the West". (Gov't Exh. 9, p. 7). The acquisition of the Ralph L. Smith Lumber Company, and the construction of the mill at Anderson were further steps in this program. The acquisition of BMT was still another part of K-C's program of capital development in the western states.

Prior to entering into negotiations with BMT, K-C officials had negotiated to acquire Carpenter Paper Company, a large chain of paper merchants in the West and Midwest. On November 9, 1960, Mr. Kimberly, Chairman of the Board of K-C, wrote to Mr. Holland, President of Carpenter, and offered to purchase Carpenter in return for K-C stock having an approximate value of $40 million. Carpenter considered this to be a serious proposal but declined it. Shortly thereafter, Carpenter's acquisition by Champion Paper, Inc., was announced. (Stipulated testimony of Kenneth C. Holland; Gov't Exh. 19; Gov't Exh. 21; Stip. 1, ¶¶ 59–65).

Negotiations between K-C and BMT commenced sometime in December, 1960, and the acquisition was consummated on June 30, 1961 (Stip. 1, ¶¶ 6, 45).

The relationship between K-C's existing and planned manufacturing facilities and paper merchant distribution is also apparent from the "Shasta Reports", prepared in connection with the construction of the new mill at Anderson, California. (Gov't Exh. 17, 18). These reports show that *K-C looked to paper merchants* for the distribution of its products in the West. The Shasta Expansion Report states in part:

Kimberly-Clark's latest capital development in the Western States was the acquisition of Blake, Moffitt and Towne on June 30, 1961. * * * Blake, Moffitt and Towne is one of the *major paper merchant chains in the West,* with 18 divisions distributing both printing and industrial papers throughout the 6 Western States. Their volume is about 17% of the total paper merchant sales in the 11 Western States as estimated by the National Paper Trade Association. Their total volume in 1962 was approximately $69,990,000—*39% of which was generated from approximately 68,000 tons of printing and fine paper*. Blake has the organization and facilities, along with the location, economic environment and trade franchise for a very vigorous growth. It is confidently expected that they can and will increase their sales by at least 50% by 1970. (Gov't Exh. 18, pp. 3–4) (Emphasis added)

This report contains a map which shows the location of the Fullerton Mill, the Shasta Mill and each of the BMT warehouses and plots the highway routes from the mills in question to the BMT warehouses. (Gov't Exh. 18, facing p. 28).

The K-C document entitled "Blake, Moffitt & Towne, Inc. First Report, February 13, 1961", which was prepared to analyze the BMT acquisition and circulated to top officials of K-C, notes that Dean Witter & Company stated "that many major paper manufacturers would find such a merger [with BMT] an extremely attractive means of greatly strengthening their West Coast position". (Gov't Exh. 34, p. 5). At pages 35–36 of this report, various competitive paper manufacturers were analyzed as potential purchasers of BMT and BMT's value as a captive outlet noted.

A memorandum, prepared by H. P. Westler, then K-C's Western sales manager, and incorporated in Government's Exhibit 34, states:

> One thing that should very carefully be thought of on our part is the complete coverage of the areas in which they [BMT] serve, and when you realize that, as far as the printing business is concerned, every printer must have daily reasonable amounts of sulphite papers, this makes them an excellent prospect to get this type of business. (Gov't Exh. 34, Exhibit V, p. 4).

Mr. Westler continues:

> *Opinion on Kimberly-Clark problems of West Coast coverage if Blake, Moffitt & Towne merge with a competitive company.* The problems that we would have in carrying out the future plans on the Coast would be greatly hampered if some other mill were to acquire this operation, and I firmly believe that, from what we have heard and seen, if we do not acquire this company, someone else will within the year. \* \* \*
>
> \* \* \* \* \* \*
>
> \* \* \* if we can come to a reasonable agreement price wise with Blake, Moffitt & Towne, *I would strongly recommend that we acquire this operation, as with it there should be no immediate or future problems to secure the tonnage necessary for our West Coast Mill.* (Second emphasis

added) (Gov't Exh. 34, Exhibit V, p. 5).

*Operation of BMT subsequent to acquisition.*

After the acquisition the assets and personnel of BMT were absorbed into K-C. BMT became a division of K-C, placed under the supervision of Mr. Westler, who became President of BMT.

Before the acquisition, the various divisions and branches of BMT were autonomous in their operations; after the acquisition the autonomy was taken away and the divisions and branches operated under the control of "headquarters" in San Francisco (see Tr. 1393). Since the acquisition, several other former K-C employees have taken over positions of responsibility in the BMT Division.

Immediately following the acquisition, several types and grades of K-C papers, which were not carried by BMT before the acquisition, were added to the BMT line. Divisions of BMT which had not carried certain types of K-C products began to carry them also. As a result, K-C has become one of BMT's leading suppliers.

Prior to the acquisition, the Los Angeles Division of BMT purchased no envelopes, mimeo-duplicator paper, or sanitary paper products from K-C. A year and a half after the acquisition, in 1963, the Los Angeles Division purchased over $220,000 worth of K-C products in these categories (Gov't Exh. 81). Prior to the acquisition, the San Francisco Division of BMT purchased neither mimeo-duplicator papers nor sanitary paper products sold by K-C; by 1963 it purchased almost $300,000 worth of such products (Gov't Exh. 82). Prior to the merger, the Seattle Division purchased no covers, bristols or index papers, envelopes, mimeo-duplicator papers, or sanitary paper products made by K-C. In 1963 it purchased about $130,000 worth of such products (Gov't Exh. 83).

K-C's sales to BMT rose from about $1,368,000 in 1961 to approximately $3,788,000 in 1963. The increase in sales by

K-C to BMT has been most pronounced in terms of specific product categories. K-C's sales of printing and fine paper products increased from $886,000 in 1961 to $2,669,000 in 1963, and K-C's sales of sanitary paper products increased from $6,000 in 1961 to $599,000 in 1963 (Gov't Exh. 80). The increase has included K-C sales to BMT of virtually every product which BMT buys from K-C.

K-C's increased sales to BMT have pre-empted BMT as a source of new or additional business for K-C's competitors, and, in some cases, as K-C's sales to BMT have gone up, BMT's purchases from K-C's competitors have actually declined, as, for example, in coated papers.

Prior to 1961, Consolidated Papers, Inc. was BMT's leading supplier of coated papers. K-C sold no coated paper to BMT. Consolidated Papers were well accepted by BMT customers (Tr. 1397). Immediately after the acquisition, K-C coated papers were added to the BMT lines. From 1960 to 1964, Consolidated's sales to BMT decreased from $997,000 to $324,000. During the same period, K-C's sales of coated paper to BMT increased from nothing in 1960 to $1,139,-000 in 1964. (Gov't Exh. 181). In another instance, Scott Paper Company's sales to BMT declined on those items which K-C sells to BMT. (Tr. 1049–53).

As a result of its increased sales of printing and fine papers to BMT, K-C, which supplied 2.62 per cent of BMT's total purchases of such papers in 1960, supplied 11.6 per cent of BMT's total purchases of such papers by 1964 (Gov't Exh. 133).

In 1960, K-C sold $502,730 worth of coarse paper and paper products to BMT; by 1964, BMT's coarse paper and paper products purchases from K-C were $1,-109,687 (Gov't Exh. 133). K-C has become a very important supplier of sanitary paper products to BMT. In 1960, K-C supplied none of BMT's sanitary paper products; by 1964 it was one of BMT's principal suppliers of sanitary paper products and furnished 27.2 per cent of BMT's total purchases of sanitary paper products from such suppliers (Gov't Exh. 130).

By virtue of the acquisition, K-C controls BMT. During the pendency of this litigation, while K-C has controlled BMT, its sales of various products to BMT increased substantially. Additionally, it should be noted that in some instances during the same period K-C used its economic resources to secure loans which resulted in increased purchases from BMT by printing establishments who thereby became obligated to K-C.

*K-C's acquisition of BMT as part of a trend.*

This acquisition is part of a substantial and significant trend of acquisitions of paper merchant houses and paper merchant chains by large manufacturers of printing and fine paper, as the defendant acknowledges.[7] During the period 1957–1964, 5 large manufacturers of printing and writing paper acquired 21 business entities operating 153 paper merchant houses with combined 1963 sales of $441 million, and representing more than 12 per cent of all paper merchant sales in the United States.[8] All but two of these occurred in the period 1961–64. Nationally, BMT was one of the three most im-

7. The existence of this trend was acknowledged by defense counsel at the hearings held before this Court on April 26, 1965 (Tr. of hearing of April 26, 1965, p. 41, lines 3–5):

  Now, there has been in this market, and we confess a great many purchases of independent paper merchants by companies such as Kimberly-Clark. * * *

8. In 1963, the total sales of the acquired paper merchant establishments were approximately $441,245,000 (Gov't Exh.

163). Total sales by all paper merchants in the United States in 1963, as reported by the Bureau of the Census, were $3,-658,310,000 (Stip. 3, ¶9). Hence, the paper merchant acquisitions between 1957 and 1964 of five paper manufacturers, Champion Papers, Inc., Kimberly-Clark, Hammermill Paper Co., Mead Corp. and Nekoosa-Edwards Paper Co., represented approximately 12.06% of all paper merchant sales.

portant merchant chains acquired.[9] In the area of its operation (the 6 named western states), it had more outlets than any other merchant chain acquired during this period.

The trend forecloses other manufacturers. As the representative of a non-integrated mill stated, "as there are more mill-owned merchants, markets for mill, such as ourselves will continue to decrease." (Tr. 1582). Acquisitions by competing paper manufacturers put non-integrated mills "in the position where our distribution in these markets was out of control". (Tr. 412). Thus one mill acquired outlets to give the firm "every assurance that we would continue this distribution uninterrupted", (Tr. 1638) and another mill has been acquiring paper merchants "to stimulate the grades of our own products". (Tr. 1455).

Acquisitions of paper merchants by leading paper manufacturers have a "chain reaction" effect. Witnesses from paper manufacturing firms testified that their firms acquired paper merchants because of concern that a competitive firm would acquire the chains if they did not. Such considerations are reflected in the testimony of the Vice President of Hammermill Paper Company (Tr. 414–415) and the Vice President of Nekoosa-Edwards Paper Co. (Tr. 1636).

Kimberly-Clark itself considered the acquisition of BMT "highly desirable in view of the industry movement toward this type of intergration". (Gov't Exh. 35). Before agreeing to aquire BMT, it negotiated with and offered to purchase Carpenter Paper Co., another large chain of paper merchants. When K-C decided to acquire BMT, BMT was "the last established paper chain available on the West Coast" (Gov't Exh. 34, p. 40), and "if K-C [did] not acquire the company, somebody else [would]". (Gov't Exh. 34, p. 35). At about the same time, K-C also considered acquiring Dixon & Co. "because of its 'fit' with B.M.&T." (Gov't Exh. 28, p. 3). "Kimberly-Clark's interest in merging with Dixon & Company [was] the result of its location and the general activity currently going on with respect to paper manufacturers and their distribution problems". (Gov't Exh. 27A). K-C determined not to continue negotiations with Dixon because of "certain legal complications" (Gov't Exh. 29, p. 1).

Clearly, there is a substantial self-perpetuating trend in the paper industry of paper merchant acquisitions by paper mills. Kimberly-Clark was a participant in the trend.

Defendant proposed a set of findings describing in some detail the BMT negotiations, which it claims were at the suggestion of BMT and had for their purpose an investment benefit that would return for each share of K-C stock issued to effectuate the merger higher earnings per share than the earnings per share being attained prior to the acquisition. The short answers to these claims are (1) that such acquisition may, and in this instance did, violate Section 7, regardless of who suggested it, and (2) that K-C was an active participant from the very beginning of the negotiations, not solely for investment, if at all for investment, but primarily because it would benefit K-C to acquire BMT, rather than to permit some competitive manufacturer to acquire it (Gov't Exh. 34, Exhibit VII, p. 3; Gov't Exh. 34, Exhibit V, p. 5; Gov't Exh. 34, p. 35)

9. The following table compiled from Government's Exhibit 163 compares the total annual sales of the 5 most important chains, on the basis of total dollar sales, acquired between 1957 and 1963:

| Year | Acquiring Firm | Acquired Firm | 1963 Sales ($000) |
|---|---|---|---|
| 1961 | Champion | Carpenter | $ 99,900 |
| 1961 | Mead | Chatfield | 79,800 |
| 1961 | Kimberly-Clark | BMT | 70,891 |
| 1963 | Nekoosa-Edwards | Butler | 42,000 |
| 1962 | Champion | Whitaker | 41,800 |

448

and because with such acquisition, there would "be no immediate or future problem to secure the tonnage necessary for our West Coast Mill" (Gov't Exh. 34, Exhibit V, p. 5). When the Executive Committee of K-C considered the acquisition, it noted that "the acquisition of Blake, Moffitt & Towne was considered highly desirable in view of the industry movement toward this type of integration, and particularly in view of our program of expansion of manufacturing facilities on the West Coast" (Gov't Exh. 35).

K-C's negotiations with other paper merchants (i.e., Carpenter Paper Co. and its consideration of the acquisition of Dixon & Co.) confirm its interest in acquiring merchants and rebuts defendant's suggestion that K-C was not serious about acquisitions.

Defendant's assertion that the acquisitions of other paper merchants by paper mills "were initiated by the paper wholesaler involved, and not the paper manufacturer", is for the reason stated above, immaterial. Furthermore, defendant's analysis of acquisitions and the significance thereof is misleading and incorrect. The evidence demonstrates that several considerations led to the trend of acquisitions, including the industry-wide pattern of acquisitions, the capture of assured distribution outlets under the control of the acquiring manufacturer, and the stimulation of sales of the acquiring mill's products through its captive merchant (Tr. 412–413, 1455, 1638; Gov't Exh. 34–36).

The ownership of a paper merchant by a paper mill introduced a new factor into the purchasing decisions of theretofore independent paper merchants. But for the acquisition, the acquired merchant might have changed suppliers, or considered other mill's products in preference to those of the mill which became their parent. After the acquisition, it is folly to imagine that significant amounts of the parent's products would be replaced by another mill's paper.[10] The result of such acquisitions may be to foreclose competing manufacturers from the source of distribution represented by the acquiring merchant (Tr. 412, 1582). This is the test under amended Section 7; it is not part of the Government's burden to show actual foreclosure; however, the evidence in this case goes beyond the statutory test and clearly rebuts defendant's assertion that the acquisitions have not "resulted in any foreclosure of markets or any injury to competition". (Defendant's Proposed Findings of Fact 7, 9). BMT's increasing purchases from K-C in a relatively short time establish the probability of future foreclosure.

*The "paper merchant".*

Having outlined the history of K-C's acquisition of BMT and the factors that resulted in and motivated such acquisition, consideration must now be given to the place of BMT in the marketing of paper and paper products.

Defendant contends that plaintiff misconceives the nature of BMT's role as a distributor of paper and paper products; that it has no realistic understanding of the nature of BMT's competition; that the label "paper merchant" lacks meaning and intent in that it "is not a term of art and it does not describe a definite type of business enterprise having the characteristics which plaintiff proposes to ascribe to it", and that when the term "paper merchant" is used, it is not used in the special sense plaintiff ascribes to it.[11] In effect, defendant contends

10. Cf. FTC v. Consolidated Foods Corp., 380 U.S. 592, 599, 85 S.Ct. 1220, 14 L.Ed. 2d 95 (1965), quoting with approval the Commission's statement: "If reciprocal buying creates for Gentry a protected market, which others cannot penetrate despite superiority of price, quality, or service, competition is lessened whether

or not Gentry can expand its market share."

11. Defendant asserts in its post-trial brief (p. 34) that:
BMT is in one sense engaged in many different businesses, but in all of them it is acting as a wholesaler of paper. To talk about "paper merchants" as a

that if any label is to be used to describe the nature of BMT as a business enterprise, it should be "paper wholesaler", which covers "all business establishments (including specialty houses) which sell paper and paper products at the wholesale level, except manufacturers and converters".

For the reasons hereinafter stated, this Court does not agree with these conclusions of defendant and is satisfied that reliable industry evidence in this case substantially sustains the classification given BMT by plaintiff.

Defendant lists approximately 30 different types of enterprises [12] which are engaged in the sale of paper or paper products in one form or another at the wholesale level and stresses the fact that of the 61 classified telephone directories introduced in evidence, not one of them in its "yellow pages" carries a heading or listing of "paper merchants".

The existence of specialty houses, the listings in the classified telephone directories and the fact that BMT carries and in some degree trades in the same items as specialty houses are facts of no material significance to the issues here involved and have no material bearing on the role of BMT as a primary distributor of the four categories of paper and paper products alleged by the Government as constituting lines of commerce within the meaning of Section 7. If any one of these four categories, or two or more of them in combination, constitutes a

line of commerce and the effect of the acquisition of BMT by K-C may be substantially to lessen competition in any section of the country, it matters not what the classified telephone directories show, it matters not whether BMT carries and trades in some of the same items as the specialty houses, and it matters not whether BMT be labeled as a "paper merchant" or a "paper wholesaler". While this Court is satisfied from the evidence that the "paper merchant" is a recognized and meaningful commercial medium for the effective distribution and sale of paper and paper products and that BMT is just such an enterprise, regardless of the label you give BMT, this acquisition had the effect of tying an economically significant customer in the nation, and more particularly in the six western states, to a leading supplier in such manner as to empower that supplier to foreclose competitors "from a segment of the market otherwise open to them".

Eleven representatives from paper manufacturing companies testified concerning the function performed by paper merchants and their importance in the distribution of paper products. Their testimony, which was ignored by the defendant, which stands uncontroverted and which has been corroborated by other evidence, presents a clear picture of the commercial realities of the paper industry. It shows that paper merchants have a distinct, recognized and accepted meaning and place in the paper indus-

---

homogenous group of enterprises engaged primarily in competition with each other, and only casually and on the fringes with specialty houses, is to talk about a never-never land, dreamed up in a Washington armchair, and bearing no resemblance whatsoever to the realities of the market place.

12. Defendant in its post-trial brief at pages 28–33, lists: (a) Wholesale stationers, school and office supply houses; (b) Retail stationers; (c) Business machine houses; (d) Wholesalers of carbon paper, art supplies, business forms, loose-leaf supplies and filing supplies; (e) Envelope containers; (f) Janitorial supply houses; (g) Hotel and motel supply companies; (h) Hospital supply companies; (i) Barber and beauty supply houses; (j) Laundry supply companies; (k) Fountain supply houses: (l) Bar supply companies; (m) Restaurant supply houses; (n) Paper cup manufacturers and distributors; (o) Tag and ticket manufacturers and distributors; (p) Tape manufacturers and distributors; (q) Paper specialty houses; (r) Label manufacturers and distributors; (s) Bag companies; (t) Box and carton companies; (u) Wholesale druggists; (x) Service stations and automotive supply companies; (y) Agricultural supply houses; (z) Dairy supply houses; (aa) Bakery supply houses; (bb) Florist supply houses; (cc) Building material supply companies; (dd) Linen supply houses.

try,[13] and that paper manufacturers recognize, rely upon and need paper merchants. Paper manufacturers know what paper merchants are. They rely upon them for the distribution of their product because experience and commercial realities require them to do this. They need them and have no feasible alternatives for them. Gerard Veneman, Vice President of Nekoosa-Edwards Paper Co., whose testimony is typical of that of the manufacturer witnesses, testified as follows:

Q. Do paper merchants offer a well defined function in distributing your products for you?

A. They clearly do.

Q. What is that function?

A. * * * The company has to have a representative sales force. They must have a warehouse * * * and stock adequate quantities of paper to service the market.

They must have transportation facilities to deliver the paper efficiently and promptly. And, finally, they should have good credit so that they are able to carry, without any stress or strain, the business that they write in our behalf.

Q. And do they offer services to the users who buy from them?

A. They offer extensive services to the users.

Q. What services are they?

A. Well, they offer advice and counsel in the selection of paper. They offer, as I mentioned, this inventory advantage, delivery. They offer an intelligence with regard to the type of equipment on which the paper is to be printed or on which it is to be used. And, of course, they offer considerable attention to their problems as it concerns inventory at the printer level. (Tr. 1629–1630).

The testimony of representatives of other mills is similar.[14]

Paper manufacturers who now rely on merchants cannot distribute their paper directly or use other forms of distribution, such as a business machine house and janitorial supply houses, as a replacement for paper merchants. Mr. Murtfeldt, the Vice President of Marketing for Consolidated Papers, Inc., who was also Chairman of the Printing Paper Manufacturers Association, testified:

Q. Now, if you wanted to engage directly in the distribution business, is there any feasible method by which you could do this other than by the purchase of present wholesale outlets?

THE WITNESS: We don't know of any economically feasible method. Because we would have to immediately employ some 2,000 salesmen and put them in 200 warehouses and offices in every city of the United States. (Tr. 650–651).

The same witness also testified:

Q. Could Consolidated accomplish the same sales objective by dealing with brokers, machine supply

---

13. The fact that "paper wholesaler" was the term first used by plaintiff in its complaint in no way negates the fact that BMT is a paper merchant. The record in this case shows that "paper merchant" is almost as much a part of the trade vernacular as the word "paper" itself. Indeed, witnesses for both the parties used the term "paper merchant" spontaneously throughout the record. (Tr. 503, 723, 1071, 1320, 1424, 1467, 1707, 1770, 2953.)

14.

| John Franzen | Hammermill (Tr. 391) |
| Lawrence B. Kelley | International Paper Co. (Tr. 1722–23) |
| William S. Kemp | Weyerhauser Company (Tr. 746) |
| Maxwell Bardeen | Simpson-Lee Paper Co. (Tr. 1656–57) |
| Harold Murtfeldt | Consolidated Papers, Inc. (Tr. 646–48) |

houses, or other types of whole-salers than paper merchants?

A. *Under no circumstances.* (Tr. 686, emphasis added).

Mr. Wilkinson, Western Sales Manager for Scott Paper Co., which manufactures sanitary paper products, noted that, without paper merchants:

> * * * We cannot profitably distribute our goods on a direct basis to the user in the Western states except in a very fractional volume of what we are now distributing. (Tr. 1045).

He also testified that other wholesalers, such as linen supply houses, could not be compared with paper merchants because they deal with a different clientele in a different sort of trade (Tr. 1018), and that " * * * in this market in the West * * * " he has not found a janitorial supply house which " * * * would give as strong support to our particular products * * * as do paper merchants (Tr. 1036).

Mr. Franzen of Hammermill testified that his firm had been relying on paper merchants since the founding of the company in 1896 and that paper merchants were its "life stream". (Tr. 391–93). He noted that if Hammermill attempted to sell direct:

> * * * The number of salesmen selling for us as employees of our distributors numbers 2,000, and if we lost 2,000 salesmen obviously we would have difficulty reaching the consumer of our product. (Tr. 439–440).

Mr. Murtfeldt testified that the only feasible alternative method by which Consolidated could engage directly in the distribution of paper would be by acquiring established paper merchants (Tr. 650–651).

Recognition and need for paper merchants is also reflected in manufacturer testimony on acquisitions and mergers. Mr. Eppie, of Standard Packaging Company, testified that his firm depends upon paper merchants, and that as paper merchants were acquired by competing mills, his markets became more limited. He noted that as " * * * there are more mill owned merchants, markets for mills, such as ourselves will continue to decrease". (Tr. 1582).

Testimony from firms which have made acquisitions confirms the reliance of mills on merchants. Acquisitions of its merchants by competing manufacturers would have put Hammermill " * * * in the position where our distribution in these markets was out of our control". (Tr. 412). Similarly, Nekoosa-Edwards acquired the Butler chain in order to assure that it would " * * * continue this distribution uninterrupted". (Tr. 1638).

Thus, uncontroverted testimony from representatives of paper manufacturers establishes that paper mills recognize and accept paper merchants as necessary conduits through which they distribute their products. Direct selling, or other types of wholesalers, are not feasible substitutes for the paper merchant. Experience and commercial reality have taught the manufacturers that they must depend upon paper merchants.

Documents admitted in evidence from the defendant's files demonstrate quite clearly that the defendant itself understands what paper merchants are and relies upon them for the distribution of its products. For example, Mr. H. P. Westler, then K-C's western sales manager and now president of BMT, stated that K-C's problems " * * * in carrying out the future plans on the Coast would be greatly hampered if some other mill were to acquire this operation [BMT]". (Gov't Exh. 34, Exhibit V, p. 5). On the basis of his analysis, Mr. Westler concluded:

> * * * I would strongly recommend that we acquire this operation, as with it there should be no immediate or future problems to secure the tonnage necessary for our West Coast Mill.

(Gov't Exh. 34, Exhibit V, p. 5).

Contrary to defendant's assertions, other evidence in the record also establishes that paper merchants perform important functions in the distribution of paper and paper products. Testimony

**452**

of paper merchants, both at trial and in the depositions on which defendant relies, echoes testimony given by representatives of the paper mills (Tr. 1179, 1180, 281–83, 537, 932, 954, 1320–21; Abrams Dep. 38–40; Dickie Dep. 19–20; Tatman Dep. 20–21).

Witnesses from establishments which purchase from paper merchants also clearly recognize paper merchants and the functions and services they offer. Morris E. Jeffers, a printer in Spokane, testified that the services furnished by paper merchants were " * * * indispensable to [his] business" (Tr. 328). Similar testimony came from John G. Reid, of A. Carlisle Company, Reno (Tr. 505) and from other printers.[15]

The unique and important role of the paper merchant has been clearly established by the evidence in this case.

Defendant's argument that paper merchants face some competition from other types of distributors does not rebut the Government's showing. United States v. Philadelphia National Bank, 374 U.S. 321, at 326–327, n. 5, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The test of a relevant market is whether the combination of products and services is " * * * sufficiently inclusive to be meaningful in terms of trade realities." Crown Zellerbach Corp. v. Fed. Trade Comm., 296 F.2d 800, 811 (9th Cir. 1961), cert. denied 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962); United States v. Philadelphia National Bank, supra, 374 U.S. at 357, 83 S.Ct. 1715. The plaintiff has met this test. Defendant cites no case in which the Supreme Court has rejected a relevant market on the grounds that there was fringe competition from outside the proposed market, under Section 7, and there are none.

In United States v. Philadelphia National Bank, supra, 374 U.S. at 326, 83 S.Ct. at 1721, the Court held that the term " 'commercial banking' describes a congeries of services and credit devices", which encompasses a relevant line of commerce. In so holding the Court noted (374 U.S. at 327, n. 5, 83 S.Ct. at 1721):

> * * * many other institutions are in the business of supplying credit, and so more or less in competition with commercial banks * * * for example: mutual savings banks, savings and loan associations, credit unions, personal-finance companies, sales-finance companies, private businessmen (through the furnishing of trade credit), factors, direct-lending government agencies, the Post Office, Small Business Investment Corporations, life insurance companies.

Having demonstrated that the paper merchant function is recognized in the industry and that paper merchants are essential to the distribution of paper products, the next step is to define the specific products involved.

*The lines of commerce.*

*Printing and fine papers and coarse paper and paper products combined.*

The defendant agrees "that paper and paper products as a whole constitute a relevant product line in this case". (Def. Post-Trial Brief 53) Since paper and paper products fall into two broad classes, (1) printing and fine papers and (2) coarse papers and paper products, which together comprise essentially the entire range of paper products sold by paper merchants, this combination of printing and fine papers and coarse papers and paper products is a line of commerce in which may be measured the market position of BMT among all paper merchants, and the effect of its demise as an .independent paper merchant.

Each of these two broad classes or groups of products is also a line of commerce within the meaning of Section 7. Utilization of lines of commerce within a broader line is in accordance with Section 7 of the Clayton Act, for, within a market, "well-defined submarkets may exist, which, in themselves, constitute

---

15. The parties stipulated that if called at the trial, approximately eighteen other printers listed as witnesses by the Government would give testimony of the same nature as the witnesses actually called. (Stip. filed January 17, 1966).

product markets for antitrust purposes." Brown Shoe Company v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

*Printing and fine paper.*

The difference between "printing and fine" and "coarse paper" and paper products is universally recognized in the industry.[16] Since the defendant states in its post-trial brief that "on the basis of the evidence in this record, [it] is now willing to accept 'printing and fine paper and paper products' as a relevant sub-product line" (Def. Post-Trial Brief 53), there is no need for the Court to review the evidence which clearly establishes this accepted relevant sub-product line.

*Coarse paper and paper products.*

The defendant, as above indicated, has in effect admitted the existence of a line of commerce embracing all paper and paper products and also admitted a sub-product line consisting of printing and fine paper, but denies that coarse paper and paper products constitute a line of commerce. The record will not support this denial. The evidence clearly indicates that the industry recognizes two distinctive classes of paper. The distinctions between them are obvious: printing and fine paper is designated primarily to be printed or written upon; on the other hand, coarse or industrial papers are recognized as paper and paper products, the intended use of which is other than to be printed upon. Included in the cate-

gory "coarse" papers or "industrial" papers are kraft papers, wrapping papers, bags, corrugated board, cartons, boxes, wipers, tapes, and sanitary papers. Their uses are diverse, but they are primarily service products intended for use in business and industry. It is their primary use and the obvious differences betwen these products and printing and fine papers which result in the common industry recognition of coarse papers as a category separate and apart from printing and fine papers.

Paper merchant catalogues are designed "printing" or "industrial". K-C and BMT records are kept in terms of these categories. Paper merchants themselves classify their operations and salesmen in terms of "printing and fine" on the one hand and "coarse" or "industrial" on the other. The terms are an accepted part of the trade vernacular, and witnesses used the distinction spontaneously throughout the trial.[17]

■ The essence of the defendant's objection to the coarse paper line of commerce seems to be its contention that all coarse paper products are not used interchangeably. The Supreme Court has flatly rejected the position that a product market or sub-market under Section 7 can consist of only items which are completely interchangeable. In United States v. Continental Can Company, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), the Court held that glass and

---

16. "Printing and fine papers" are frequently referred to in the industry as "printing and writing papers" (Tr. 643–644). "Coarse paper" is frequently referred to as "industrial paper" (Tr. 539, 1337, 1344). Paper merchants are classified as "fine", "coarse", or "dual", depending upon which of the groups they primarily handle. BMT was a "dual" paper merchant.

17. Industrial statistics, including those published by the United States Bureau of Census, are tabulated separately for fine and coarse paper and paper products. While such statistics do not *ipso facto* establish relevant markets, they may be used to measure a relevant market which has been established by evidence showing

industry usage and trade practice. As the 9th Circuit observed in Crown Zellerbach Corp. v. Fed. Trade Comm., 296 F. 2d 800, 807, cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962):

* * * we must recognize that it is possible that this [census] grouping has behind it some facts or circumstances relating to the paper industry which may have led to the grouping
* * *

In the instant case the testimony of Mr. John Albright, Chief Wholesale Trade Division, Bureau of the Census, establishes the lengthy and careful study of trade practices and industry usage which is made by Census to insure that its classifications, in fact, correspond to commercial realities. (Tr. 2019–20, 2046).

metal containers together constitute a relevant line of commerce, even though there are some end uses for which glass and metal do not compete and there was not complete inter-industry competition. The Court said 378 U.S. at 457, 84 S.Ct. at 1746:

> * * * We would not be true to the purpose of the Clayton Act's line of commerce concept as a framework within which to measure the effect of mergers on competition were we to hold that the existence of noncompetitive segments within a proposed market area precludes its being treated as a line of commerce.[18]

The defendant itself has admitted that printing and fine papers constitute á line of commerce, even though it states that it does not agree that all such products "are in any sense all interchangeable". It offers no reason to sanction interchangeability in one line and reject it in another.

Having established the sub-product line of "coarse" or "industrial" as a valid submarket, we must now consider whether this market may be further sub-classified as sanitary paper products.

*Sanitary paper products.*

Sanitary paper products are a distinctive product submarket within the coarse paper and paper products line of commerce and include facial tissue, toilet tissue, sanitary napkins, paper towels and paper napkins. They are handled by dual and coarse paper merchants, who sell them principally to industrial customers, such as institutions, factories, schools, hotels and public buildings, for on-premises use. Usually, the sanitary paper products sold by paper merchants are especially packaged and are not sold for consumption in the home (Gov't Exh. 118, 119; Tr. 997–98). Particularly in the case of facial tissues and toilet tissues, resale packages can be substituted for industrial packaged products, but the converse is not true.[19] Sanitary paper products are a recognized and distinctive group of products, within the broader market of industrial products handled by paper merchants. As one witness said, "Our products which we classify as industrial must be further sub-classified as sanitary products." (Tr. 1010).

The industry so recognizes them, and a distinction based upon their intended usage is obvious. They are converted from pulp and basic tissue stock on special machinery designed for this purpose. Thus, they require "unique production facilities". They are widely recognized both in industry and by the public as a distinctive type of product. They were found "separately and collectively" to be lines of commerce by the Federal Trade Commission in a case involving K-C's principal competitor in the sanitary field. Scott Paper Co. v. Fed. Trade Comm., 301 F.2d 579, 580 (3rd Cir. 1962).

In 1958 total sales of sanitary paper products by paper merchants were $192 million throughout the country and $31 million in the 6 western states where BMT operated. In either case the market is " * * * a distinct and substantial one". Crown Zellerbach v. Fed. Trade Comm., supra, 296 F.2d at 812; See United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057.

Sanitary paper products sold through paper merchants are a relevant submarket for purposes of Section 7.

*Relevant sections of the country.*

In determining the relevant section or sections of the country, the

---

18. In United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593–594, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the Court held that "automotive finishes and fabrics" were a line of commerce. Obviously, there are substantial differences between finishes and fabrics; they are certainly not interchangeable.

19. Other industrial sanitary products, such as paper towels and paper napkins, are generally coarser and less absorbent than those for domestic consumption. (Def. Exh. 295).

primary consideration is where "the effect of the merger on competition will be direct and immediate." United States v. Philadelphia National Bank, supra, 374 U.S. at 357, 83 S.Ct. at 1738, 10 L.Ed.2d 915. As the present case involves a vertical acquisition, it is particularly appropriate that the inquiry evolve around "the geographic structure of the supplier-customer relations". (Ibid.) In proving a relevant section of the country under amended Section 7, it is not "essential for the Government to show a 'relevant geographic market' in the same way the corpus delicti must be proved to establish a crime." United States v. Pabst Brewing Co., 384 U.S. 546, 549, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). Section 7 "requires merely that the government prove the merger has a substantial anti-competitive effect somewhere in the United States—'in any section' of the United States." (Ibid.) Nor does Section 7 call for "the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground". (Ibid.)

*National Market.*

The parties are agreed that the nation as a whole is a section of the country within which to measure the anti-competitive effects of this acquisition. Although, on a percentage basis, BMT was predominantly supplied by mills in the 6 western states, other mills which supply, or could have supplied, BMT with at least some of its requirements are located throughout the country. One measure of the potential foreclosure of such mills from the BMT market is, therefore, a showing of BMT's market share in terms of national distribution by paper merchants or in terms of distribution by paper merchants in the 6 western states. What that share was will be explored in the Court's discussion of its effect under Section 7.

*The Western Market.*

Evidence adduced at the trial shows that within the broader national market there is a definite western submarket, and that such submarket is not inconsis-tent with the national market on which the parties agree. This is established by industry recognition and practice, by the testimony of representatives of both mills and paper merchants and by K-C's own statements, programs, and business practices.

■ "Just as a product submarket may have § 7 significance as the proper 'line of commerce,' so may a geographic submarket be considered the appropriate 'section of the country'." Brown Shoe Co. v. United States, supra, 370 U.S. at 336, 82 S.Ct. at 1530, 8 L.Ed.2d 510. In this case the evidence amply demonstrates, as *Brown Shoe* requires, the existence of a western market which corresponds " 'to the commercial realities' of the industry and [is] economically significant." (Ibid.)

In this case the appropriate western market is the 6 western states area which BMT served, consisting of California, Oregon, Washington, Idaho, Nevada and Arizona. The Court recognizes, however, that some "fuzziness would seem inherent in any attempt to delineate the relevant geographic market." Philadelphia National Bank, supra, 374 U.S. at 360, n. 37, 83 S.Ct. at 1740. As the Court stated in United States v. Bethlehem Steel Corporation, 168 F.Supp. 576, 602 (S.D.N.Y.1958):

An economically significant area in an industry cannot be determined with the precision of a surveyor. In considering the anticompetitive consequences of a merger there is nothing sacred about the boundary lines of a state. The impact may manifest itself in an appreciable segment of a market which may coincide with a political subdivision of a state, a state, a combination of states or the nation.

Hence, often "a workable compromise must be found." Philadelphia National Bank, supra, 374 U.S. 361, 83 S.Ct. at 1740. There is ample evidence to support the 11 western states as a realistic relevant geographic market. There is also evidence to support the 3 coast states of California, Oregon and Washington

as a relevant geographic market;[20] however, because of the existence of Denver as a significant center of market activity, a breaking point between midwest and west [particularly in freight rates (Tr. 385–386; 2982–2983; Gov't Exh. 18, p. 30)]; because the states of Idaho, Nevada and Arizona are commercially and geographically tied to the metropolitan areas of the Pacific Coast, and because it was in the 6 western states area that BMT completed, these 6 western states constitute a workable compromise. As the Court noted in Crown Zellerbach, supra, 296 F.2d at 817,[21] the immediate effect which must be measured is that of the withdrawal of the acquired company from the market in which it formerly competed. Thus, the reasoning which led the Court of Appeals to adopt a three-state area in *Crown Zellerbach* supports a six western states area here.

The existence of national competition, which is the basis for establishing the national market, does not demonstrate *ipso facto*, as defendant seems to argue, that there can be no western submarket. If this were so, it would be impossible in any case to have both a geographic market and a geographic submarket, since proof of the larger geographic market must depend upon a showing that there is competition embracing the entire market, a showing which would rebut the submarket. Yet the courts have repeatedly accepted regional markets and submarkets within a larger national market. See United States v. Pabst Brewing Co., supra, and United States v. Jos. Schlitz Brewing Co., D.C., 253 F.Supp. 129.

■ The existence of national competition and shipments into and out of a regional submarket by firms which in fact compete nationally does not show that there is no regional submarket. The primary issue in an amended Section 7 case is whether the anticompetitive effect exists, and "[p]roof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." United States v. Pabst Brewing Co., supra, 384 U.S. 549, 550, 86 S.Ct. 1668, 16 L.Ed.2d 765.

Cases decided in which regional markets and submarkets have been found set forth various criteria which have been considered by the courts in arriving at their determination of geographic markets. No single one of these criteria may be determinative. It is certainly not necessary that each case satisfy every criterion stated in the decided cases. Indeed, all these criteria have not been met in most of the decisions in which regional markets were found.

In this case the record meets every criterion which has been established to decide that a particular region is a sec-

20. In fact, it makes little difference which of the 3 areas are chosen because the core of all of them is the 3 Pacific Coast states. More than 90% of BMT's sales were made in these states. (Def. Exh. 119–137) As defendant noted in its "Summary Report on Shasta Pulp and Paper Expansion Project" (Gov't Exh. 17, p. 4):

The consumer and industrial markets of the 11 Western States are concentrated in the three coastal states and principally in the metropolitan areas of California. The three coastal states account for 75% of the total consumer market in the 11 western states. California accounts for 60% of the region's consumer market, 70% of its general industrial output, and 75% of its printing and publishing other than newspa-

pers. The Los Angeles and San Francisco metropolitan areas alone account for 35% of the region's consumer market, 50% of its industrial output, and 70% of its printing and publishing other than newspapers.

BMT's *market share was approximately 15% of all merchant sales in the 6 western states area, 14% in the 3 coast states area, and 13% in the 11 western states area. In the context of this case, the difference is not substantial.*

21. In considering the acquisition of the St. Helens paper mill, the Court noted, "the market in which St. Helens competed is of primary significance here because ultimately we are going to have to inquire what was the effect of withdrawing St. Helens as a market factor."

tion of the country. The evidence in this case distinguishes the western market on the basis of the impact of freight rates; Crown Zellerbach Corp. v. Fed. Trade Comm'n, supra, 296 F.2d at 820; United States v. Jos. Schlitz Brewing Co., supra; American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387, 398 (S.D.N.Y.1957), aff'd 259 F.2d 524 (2d Cir. 1958); the advantages of service and convenience; United States v. Philadelphia National Bank, supra, 374 U.S. at 358, 83 S.Ct. 1715, 10 L.Ed.2d 915; Crown Zellerbach Corp. v. Fed. Trade Comm., supra, 296 F.2d at 820; American Sugar Co. v. Cuban-American Sugar Co., supra; and common economic and competitive factors within the area; Crown Zellerbach Corp. v. Fed. Trade Comm., supra, 296 F.2d at 817; United States v. Jos. Schlitz Brewing Co., supra.

Moreover, virtually every witness from a paper manufacturer testified that he recognized the West as a separate market; this, too, supports its selection as a section of the country. The West, where K-C operates two regional mills and where BMT sells and distributes, is where, as stated above, "the effect of the merger on competition will be direct and immediate."

Freight rates have been accepted in a number of the decisions cited above, as a factor which distinguishes a regional market. The defendant in this case does not deny the existence of freight rate barriers and acknowledged it in the Shasta Expansion Report (Gov't Exh. 18, pp. 1–2):

> Steady expansion of paper manufacturing capacity in the West during the last 25 years has tended to eliminate zone price differentials on most paper products selling in any volume. Nevertheless, such zone price differentials are essential for Midwest mills to participate profitably in the Western market. During the same time interval, there has been a 135% increase in freight rates from Midwest production points into the Western States. It has been most apparent to Kimberly-Clark management for at least two decades, that they must eventually have West Coast production facilities, or withdraw from participating in the Western market.

Uncontroverted testimony of the witnesses for paper manufacturers establishes the impact on their business of freight rates. Typical is the testimony of Mr. Murtfeldt of Consolidated Papers (Tr. 662):

> The long freight rate from Wisconsin to the West Coast is roughly twice what it is to any other section of the United States so that it obviously is a different thing from our standpoint. We look upon the west as having different competitive forces in the sense of a different group of mills and different competitive situations than we find it in either the East or the Midwest.

Mr. Minch of Howard Paper Mills characterized the Western market as a different market area from other parts of the country in which his firm sold paper, in that freight rates tend to fence his firm out of the Western market (Tr. 1262–70). Mr. Franzen of Hammermill testified that, because of freight rates, his mill at Grays Harbor, Washington could not compete "all through the United States". (Tr. 423)

Evidence demonstrating the importance of service and convenience in establishing a western market is equally clear. The importance of service in delineating a separate market was attested to by virtually all of the manufacturer witnesses as well as by various paper merchant witnesses. Mr. Kelley of International Paper testified that his firm hopes to build a mill in the West "to properly equal the kind of service" rendered by mills on the West Coast. (Tr. 1715) He also testified that service and convenience are important in the distribution of industrial papers, as well as printing papers (Tr. 1728–29). Similar testimony was offered by other witnesses from paper mills. Mr. Bardeen, President of Simpson-Lee Paper Co., said, "the principal advantage that we have over the eastern manufacturer is that we are

here". (Tr. 1658). Similarly, Mr. Franzen stated that it would be exceedingly difficult to distribute their products effectively on the West Coast without the Grays Harbor operation (Tr. 424), and Mr. Eppie of Standard Packaging Corp. agreed that western facilities were essential to effective operations in the West (Tr. 1475). Delivery time is "very important" in servicing the paper merchant and due to "a time factor" mills in the West are better able to serve western merchants than mills located in Ohio (Tr. 1267).

Mr. Kaplan and Mr. Fraser, as paper merchant witnesses, agreed that ability to obtain paper in a matter of days instead of weeks is very important to the merchant's operations because customers frequently demand immediate delivery of items or quantities which the paper merchant does not have in stock (Tr. 941–42, 1191). Mr. Landsberg, another paper merchant witness, testified that they bought as much as 95 per cent of their paper purchases from western mills (Tr. 958). BMT, itself, in 1964, purchased 69 per cent of its paper from paper mills located in the western area (Gov't Exh. 165).

As heretofore shown, K-C and BMT, in both their advertising and marketing programs, tailored their operations to a western market. K-C's documents, and the testimony of K-C's employees, show that K-C recognizes, uses and accepts an eleven state area, its Region IV, as a separate western market (Tr. 3413). K-C recognized that the BMT acquisition was desirable "particularly in view of our program of expansion of manufacturing facilities on the West Coast" (Gov't Exh. 35), which program of expansion also accounts for the mill at Fullerton in 1956 to manufacture sanitary paper products and its acquisition six years later of the Ralph L. Smith Lumber Co. and the construction of a printing paper mill on the Smith site at Anderson, California (Shasta Mill), "for the sole purpose of producing 'western paper for western printers' ". (Gov't Exh. 174). The construction of

the Shasta Mill shows that "Kimberly-Clark has a deep interest (a $30,000,000 interest) in helping to build the West." (Ibid.)

Other economic and competitive factors also distinguish the western market. These include different competitive patterns engendered by a distribution system heavily concentrated in mill-owned merchants, different public bidding patterns, higher labor rates, lower pulp prices, higher costs for other raw materials, and higher construction costs than the remainder of the country.

Defendant has not attempted to controvert most of this evidence. It called no witnesses from paper manufacturers. Instead, it assumes and seems to argue that there cannot be a western market unless the factors discussed above are complete barriers to all shipments into and out of the area. This argument runs counter to the cases and the law. If defendant's standard were adopted, it would not be possible to prove in any case both a national market and a regional market. Section 7, as amended, envisions geographic markets and submarkets, not the either-or market choice claimed by defendant.

Defendant's suggestion that the cases which have recognized regional submarkets involved horizontal mergers, while this case considers a vertical acquisition, proposes a distinction not supported by the cases or the statute.

■ Section 7, as amended, was designed to apply to all kinds of mergers—horizontal, vertical and conglomerate. Neither the statute nor the legislative history declares that different criteria are to be applied to determine the section of the country in horizontal and vertical cases. Defendant has cited no cases which distinguish horizontal and vertical acquisitions in determining the section of the country for purposes of Section 7.

Moreover, there is no economic basis for the defendant's assertion that the relevant geographic markets should be different for vertical cases than for horizontal cases. The issue in Section 7

cases, as already stated, is whether a merger may lessen competition or tend to create a monopoly. In any case, the relevant market, itself, is always on a given plane, regardless of the relationship involved, i. e., whether the merger is horizontal, vertical or conglomerate. For example, a merger between two paper manufacturers would violate the law if it might lessen competition substantially among paper manufacturers. In the instant case, the merger also would violate Section 7 if it might lessen competition substantially among paper manufacturers seeking to sell their products to paper merchants. In either case the considerations in determining the relevant geographic market would be the same, i. e., what are the geographic markets and submarkets for manufacturers.

Defendant has cited only one case to support its claim that there cannot be submarkets in vertical cases. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). That case is wholly distinguishable from this.[22] Tampa Electric analyzed the market in which to measure the effect of a long-term requirements contract, where the purchaser was located in Florida and the seller and *all* his competitors were located in the Appalachian coal area. The Court held that all coal coming from that Appalachian producing area was the proper universe.

In the paper industry, by contrast, mills are located throughout the country, rather than being concentrated in a single producing area. Defendant's position, that the market is unitary, might be appropriate if there were no economic

and industrial differentiation of regional markets, and if the paper mills were located in a single producing area—for example, Minnesota-Wisconsin area—so that producers from the one area would ship throughout the country, competing only with each other and with no mills located in other parts of the country. The evidence demonstrates that the paper industry is not in fact analogous to the coal industry. Because of geographic dispersion, manufacturers must overcome different barriers and meet different competitors as they ship into different markets. The West is such a different market, one which, as this Court noted, is distinguished by freight rates, common economic and competitive factors, service and convenience advantages which adhere to regional producers, and industry recognition of the area as a separate market. These factors and the geographic differentiation which they demonstrate were not present in *Tampa Electric* which involved a unitary market devoid of such differentiation.[23] Accordingly, *Tampa Electric* does not, in any sense, apply to the facts of this case. Crown Zellerbach Corp. v. Fed. Trade Comm., supra, 296 F.2d at 837.

Defendant's denial of a western market in this case is contrary to the evidence, law and economics and is therefore rejected. The record establishes that there is a western market and that the effect of the acquisition will be most direct and immediate in the six western states in which BMT operated outlets.

*The effect of the acquisition.*

The impact of K-C's acquisition of BMT is clear, and if it has not already

**22.** *Tampa Electric* was decided under Section 3 of the Clayton Act, a statute which uses language similar to Section 7, but expressly omits the phrase "any section of the country"; hence, the precise statutory language at issue here was not even considered in that case.

**23.** Defendant also relies on *Tampa Electric* to support its claim that any area to which paper merchants in the West could turn for their paper supplies must be included in the relevant market. Defendant's contention ignores the testimony

of paper merchants in the West, who, for reasons of service, convenience, and cost, differentiate westen suppliers from those outside the West, and prefer western mills as sources for their paper. The preferences of paper merchants, and the reasons for them, also differentiate the western market. Although the availability of supplies from mills throughout the country would indicate a national market, upon which the parties are agreed it does not in itself rebut the western market. *Tampa Electric* does not so hold.

done so, there is a reasonable probability that it may substantially lessen competition in the six western states of California, Oregon, Washington, Idaho, Nevada, and Arizona, and in the United States, in violation of amended Section 7 of the Clayton Act. As the result of its acquisition of BMT, a substantial and significant paper merchant chain, K-C, a leading manufacturer of paper and paper products, has the power to control the paper and paper products which will flow through the important trade conduit represented by BMT.

Notwithstanding continuing antitrust investigation and litigation, K-C has, in fact, exercised this power to increase the flow of its products through BMT, to the detriment of competitive suppliers who must rely upon paper merchants for the distribution of their products. This acquisition is part of a significant, self-perpetuating series or trend of acquisitions of leading paper merchants by leading paper manufacturers. K-C, through its acquisition of BMT and its negotiations looking toward the acquisition of other paper merchant chains, has been an active participant in this trend of acquisitions, which threatens to continue.

In amending Section 7, Congress sought to arrest mergers and acquisitions "at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency," and it sought "to break this force at its outset and before it gathered momentum." Brown Shoe Co. v. United States, supra, 370 U.S. 317–318, 82 S.Ct. 1502, 8 L.Ed.2d 510. Here the trend of acquisitions of merchants by mills is substantial and continuing. This case responds to the Congressional mandate, which is addressed to a situation where "several large enterprises are extending their power by successive small acquisitions", S.Rep. 1775, 81st Cong., 2d Sess. 5 (1950), U.S. Code Cong.Service, p. 4293, is designed to "permit intervention in * * * a cumulative process", and "applies to all types of mergers and acquisitions, vertical and conglomerate, as well as horizontal." H.R.Rep. 1191, 81st Cong., 2d Sess.,

pp. 8, 11 (1949). The Supreme Court has been consistent in its endeavor to enforce this Congressional command to "preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before the trend developed to the point that a market was left in the grip of a few big companies." United States v. Von's Grocery Co., 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555.

The trend of mergers and acquisitions found in the instant case bears great similarity to the trend found in Brown Shoe Co. v. United States, supra. This trend, like the one in *Brown Shoe*, is "not the product of accident but * * * rather the result of deliberate policies." Id. 370 U.S. at 332, 82 S.Ct. at 1528. K-C considered the acquisition of BMT "highly desirable in view of the industry movement toward this type of integration." (Gov't Exh. 35). Acquisitions by other paper manufacturers were equally deliberate. Hammermill acquired a chain of merchants because of its "concern that another competitor paper manufacturer would purchase" it (Tr. 414–415). Nekoosa-Edwards acquired Butler Paper Co. to obtain "assurance that it would continue this distribution uninterrupted" and because it was distinctly "aware of the other mergers that were going on between mills and merchants", which made it apprehensive that some other mill might acquire Butler (Tr. 1638).

The record in this case discloses that as paper mills acquire merchants to control distribution, other mills view such acquisitions as a threat to their market, because they place an essential source of distribution in the hands of competition, thereby triggering subsequent acquisitions which gain momentum with each successive acquisition and counter acquisition. The record shows that K-C and Champion both negotiated for Carpenter at about the same time, and that Mead Papers, Inc., acquired Dixon shortly after K-C suspended negotiations with that firm.

This trend led to the formation of the Independent Paper Merchants' Association, composed of independent paper merchants who were concerned about the ultimate result of the trend (Tr. 1786–87). They fear the eventual elimination of the independent paper merchant, which calls to mind the admonition of the Court in Brown Shoe, supra, 370 U.S. at 344, 82 S.Ct. at 1534:

> * * * we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally-owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision.

As a result of the trend, independent paper merchants must face competitors with substantially greater financial resources who can take their profit at either the mill or the merchant level (Tr. 290–93, 1786–87).

Moreover, merchants who have spent many years and substantial sums of money achieving an acceptance of a manufacturer's product now find themselves placed in a position of being forced to compete against their own suppliers. The basic anticompetitive nature of such an arrangement was analyzed in the *Brown Shoe* opinion 370 U.S. at page 324, note 40, 82 S.Ct. at 1523.

In addition, a vertical merger may disrupt and injure competition when those independent customers of the supplier who are in competition with the merging customer, are forced either to stop handling the supplier's lines, thereby jeopardizing the good will they have developed, or to retain the supplier's lines, thereby forcing them into competition with their own supplier. See United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 613 D.C.S.D.N.Y.)

Stipulated evidence demonstrates that the series of acquisitions in the paper industry has been significant both nationally and in the western market.

During the period 1957–64, five large manufacturers of printing and fine paper acquired 21 entities operating 135 merchant houses, with combined. sales in 1963 of $441 million, representing more than 12 per cent of paper merchant sales in the United States.[24] In the western market the trend of vertical acquisitions by paper manufacturers is even more pronounced than in the nation as a whole. Testimony from paper merchants demonstrates that in the BMT market area in the West the four leading paper merchants were Zellerbach Paper Co., Carpenter Paper Co., Butler Paper Co., and Blake, Moffitt & Towne. Zellerbach has been owned by Crown Zellerbach for many years. Since 1960, the other three principal chains have been acquired by Champion, Nekoosa-Edwards and Kimberly-Clark, respectively. Other im-

---

24. In 1963 the total sales of the acquired merchant establishments were approximately $441,245,000 (Gov't Exh. 163). Total sales of all paper merchants in the United States in 1963 as reported by the Bureau of the Census were $3,658,310,000 (Gov't Exh. 164; Stip. 3, p. 9). Hence, the paper merchant acquisitions between 1957 and 1964 of five paper manufacturers, Champion Papers, Inc., Kimberly-Clark, Hammermill Paper Co., Mead Corp. and Nekoosa-Edwards Paper Co., represents approximately 12.06% of all paper merchant sales.

The acquired merchants sold substantially more printing and fine paper than coarse or industrial paper, as is apparent from the following table compiled from Government's Exhibit 161:

Sales of Acquired Paper Merchants, 1963

| Product | Sales | Percentage |
|---|---|---|
| Printing and Fine | $ 232,163,552 | 52.6 |
| Coarse (Industrial) | 131,034,294 | 29.7 |
| Breakdown not available | 77,926,569 | 17.7 |

portant western paper merchants have also been acquired. The Noland Paper Company in Los Angeles was acquired by Mead Papers, Inc. Potlash Forests acquired the Wilson-Rich Paper Co., San Francisco, Columbia Paper Co., Los Angeles and San Diego, and Grand Canyon Paper Co. of Phoenix.

The defendant in this case does not escape the prohibition of amended Section 7 by an assertion that all participants in the merger trend have not increased their share of the market since acquisition. It makes little difference whether the purpose of the acquisition is to protect existing distribution, as in the case of Hammermill and Nekoosa-Edwards, or to acquire distribution, as was K-C's acquisition of BMT. In either case the acquisition seeks and obtains for the acquiring mill the power to control significant channels of distribution and violates amended Section 7 "whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended." United States v. E. I. du Pont de Nemours, supra, 353 U.S. at 589, 77 S.Ct. at 875, 1 L.Ed.2d 1057. "The Government's burden is not to show that competition will be lessened by the acquisition, but only that it may tend to be lessened." United States v. Pennzoil Co., 252 F.Supp. 962, 977–978 (W.D.Pa.1965).

Nationally, this record presents a market situation markedly similar to that relied upon by the Supreme Court in the *Brown Shoe* case. In the western market the facts are even more persuasive, because the share of the market represented by BMT is much larger that Kinney's market share in *Brown Shoe*.

Here the parties to the acquisition were at least as significant in their respective fields as were Brown and Kinney.[25] Kimberly-Clark is the fourth largest company in the United States engaged primarily in the manufacture of paper and paper products, with, as previously stated, assets of $443 million and sales of $515 million in the years ending April 1962. It manufactures and sells a complete line of printing and fine papers and accounts for approximately 7½ per cent of total national market shipments of these papers. It is one of the two largest producers of coated printing papers in the country.

As a coarse paper manufacturer, it is the largest producer of sanitary paper products in the world and accounts for 24 per cent of total national shipments of such products. It also accounts for about 23.7 per cent and 5.6 per cent of national market shipments of tissue paper and special industrial paper, respectively. Historically, it has broadened its product lines by expansion and acquisition and it possesses the requisite capital, know-how and resources to produce and market other coarse paper items as well, if it so chooses.

As heretofore stated, BMT was the largest independent merchant chain in its market, with sales of $65,764,000 in 1960. It operated in 34 paper merchant establishments in as many cities in 6 western states at the time of the acquisition.

Under *Brown Shoe*, supra, the starting point in analyzing a vertical arrangement is the "size of the share" of the market which may be dominated by the acquiring manufacturer (Id., 370 U.S. at 328, 82 S.Ct. 1502). G. R. Kinney, the acquired firm in Brown Shoe, accounted for about 1.6 per cent of national pairage sales of all shoes; about 1 per cent of national pairage sales of men's shoes; about 1.5 per cent of national pairage sales of women's shoes; and about 2 per cent of national pairage sales of children's shoes. Nationally, BMT, the acquired chain in this case, accounted for about 2 per cent of all paper merchant sales; about 1.8 per cent of all paper merchant sales of printing papers; about 2.7 per cent of all paper merchant sales of coarse paper; and about 2 per cent of all paper merchant sales of sanitary paper.

25. Compare: Brown Shoe Company v. United States, 370 U.S. 294, 331, 82 S.Ct. 1502, 8 L. Ed.2d 510 (1962).

In terms of the six western states, BMT represents a substantially larger share of total sales. Its sales were approximately 14.9 per cent of total paper merchant sales; 14.9 per cent of all paper merchant sales of printing paper; 18 per cent of all paper merchant sales of coarse paper; and 12.5 per cent of all sales of sanitary paper by paper merchants.

While market shares in and of themselves are not necessarily determinative, they are the starting point, and when combined with the other factors present in this case, the combination leads to the inescapable conclusion that the probable effect of this acquisition in both the six western states and the United States may be to substantially lessen competition.

Market share figures in the six western states are substantially larger than those present in *Brown Shoe,* and since such figures in a relevant geographic area are one of the "most important factors to be considered when determining the probable effects of the combination on effective competition" (Brown Shoe, supra, 370 U.S. at 343, 82 S.Ct. at 1534) in that area, a good case for the Government can be made from these western states figures alone. However, in this case, as has already been in great measure pointed out, there were additional contributing factors which, when combined with the market share figures, establish the illegality of this acquisition, not only in the six western states, but in the national market as well.

Significant among these additional factors which must be taken into account in order to measure the consequences of this acquisition in the present and the future are (1) the nature and purpose of the acquisition, (2) the post-acquisition behavior on the market, and (3) the definite trend toward vertical integration in which K-C was a deliberate and significant participant. These factors and their anti-competitive effects have already been herein reviewed, and if continued, they will dry up the available outlets for independent manufacturers.

This drying up process is reflected in the instant case by the substantial volume of K-C products which have actually been added to the BMT line, notwithstanding the natural tendency of a defendant in a Section 7 case to moderate its use of the acquired power during the pendency of litigation.

Virtually from the date of the acquisition, K-C products began to flow through BMT outlets in increasing quantities. Prior to the acquisition, BMT's annual purchases from K-C totaled about one million, principally cotton content bond paper, industrial wipes, and cellulose wadding paper (Gov't Exh. 131). Following the acquisition, BMT's purchasing patterns changed. K-C sold BMT no coated paper in 1960; by 1964, the year that the Shasta mill began production, BMT's coated book paper purchases from K-C had risen to $1,145,777 (Ibid.). In other printing paper items, the change was equally abrupt. In 1960, K-C sold BMT no uncoated book paper, index and bristols, or envelopes and only $12,401 worth of chemical bond paper. In 1964, the respective totals were $213,625; $98,471; $303,607; and $180,765 (Ibid.). In 1960, K-C sold BMT $522,595 worth of printing paper, which represented 2.62 per cent of BMT's total printing and fine paper purchases. In 1964, K-C's printing and fine paper sales to BMT had increased by 390 per cent, to $2,560,995, or 11.60 per cent of BMT's purchases of those products (Gov't Exh. 128).

The principal coarse paper products which K-C sold BMT prior to the acquisition were industrial wipes and cellulose wadding packing. These sales increased slightly after the acquisition. In addition, BMT's purchases from K-C of sanitary paper products increased from nothing in 1960 to $583,139 in 1964 (Gov't Exh. 129). By 1964, K-C supplied 27.24 per cent of BMT's purchases of sanitary paper products from principal suppliers. (Ibid.).

Between 1960 and 1964, during the pendency of this litigation, BMT's overall purchases from K-C have increased

258 per cent, from $1,025,318 to $3,670,-682. (Gov't Exh. 127). In terms of "coarse" and "printing and fine", the increase was as follows (Gov't Exh. 133):

| Year | Industrial | Printing |
|------|-----------|----------|
| 1960 | $ 502,730 | $ 552,588 |
| 1964 | 1,109,687 | 2,560,995 |

In some instances, the increased sales of K-C to BMT have resulted in the actual decline of a competitor's sales. In other cases, they have resulted in failure of other competitors to secure new business. In either case, they resulted in foreclosure, since foreclosure is simply pre-emption from a share of the market.

Each K-C product which was put into BMT after the acquisition duplicated a line which BMT was already handling. This had the effect of diluting the BMT's sales efforts for other manufacturers' paper. As the Vice President of International Paper Company noted, a paper merchant "is not able to do * * * as well a job for any one of us if he dilutes his interest selling the same products from three similar mills." (Tr. 1731), and Mr. Bardeen, President of the Simpson-Lee Paper Company, found it necessary to take his products away from BMT because the handling of competing lines meant that his products were not "being sold in the manner that he hoped that they would have been." (Tr. 1664).

In such dual line situations, the merchant salesman will ultimately sell the products he promotes most diligently. Where the merchant is mill owned, the salesman will naturally promote the products which the parent mill manufactures.[26] In fact, since the acquisition, some customers and competitors of BMT were not even aware that BMT was handling other manufacturers' products which compete with K-C products (Tr. 1334). Since the acquisition, K-C papers have been consciously substituted for those of its competitors.

There is no merit to defendant's position that BMT's declining or static purchases of the papers of K-C's competitors have resulted from business reasons other than this acquisition. However, the cause of the declining sales is a question which need not be met. Honorable business motives of companies are irrelevant. United States v. E. I. du Pont de Nemours & Co., supra, 353 U.S. at 607, 77 S.Ct. 872. K-C has the power to exclude its competitors, and as seen above, did in fact do so. Congress' "concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition." Brown Shoe, supra, 370 U.S. at 323, 82 S.Ct. at 1522–1523.

Defendant also asserts that BMT's purchases from outside suppliers have increased since the acquisition and that K-C cannot presently supply all the products which BMT requires. This contention does not rebut or detract from the evidence in the record.

■ It is abundantly clear to this Court from all that it has observed in the trial of this cause and here noted that the proof in this case far exceeds the showing that the merger *may* substantially lessen competition in the distribution and sale through paper merchants of each of the four categories of paper products, as described herein, in the six western states area, as defined herein, and in the United States. No more is required.[27]

26. Cf., United States v. Pennzoil Co., supra 252 F.Supp. at 984:

Under the factual circumstances as they exist, we cannot believe that where one corporation acquires the assets of another corporation and has absolute control over who shall be the offcials of the acquired corporation, that human tendency will not constrain the acquiring corporation to favor retention of officials in the subsidiary corporation, who are most compliant and acquiescent to the wishes of those who control them.

27. The Court does not give any significant weight to the "telephone surveys" introduced in evidence by the defendant because it finds them to be unreliable, inaccurate and only remotely related to the issues in this case, nor does the Court attach any weight to the "classified tele-

Unless this acquisition is undone, K-C and its competitors will have a green light to proceed with further acquisitions.

The Court finds and concludes that Kimberly-Clark Corporation acquired the assets and business of Blake, Moffitt & Towne in violation of Section 7 of the Clayton Act.

All pending motions to strike evidence and exhibits, including defendant's motion to strike dated February 1, 1966, are denied.

The Court's findings of fact and conclusions of law, as required by Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C., will be filed in a separate document simultaneously with this order and memorandum opinion.

If the parties are able, within thirty days, to agree on appropriate relief and form of the decree to be entered, a decree may be submitted for the Court's consideration; otherwise, either party may apply to the Court, by notice of motion, within thirty days from the filing of this opinion, and the Court will set a time and conduct hearings to determine the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to Section 7 of the Clayton Act.

phone directories", for they do not demonstrate the true nature or extent of the competition that exists in the distribution of paper or paper products, nor does the

Court deem that "trade directories", such as "Lockwood's" or "SOS", are an accurate measure of paper merchant competition.